IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 24, 2004

## MARQUEZ CRENSHAW v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County
No. 99-C-1934     Steve R. Dozier, Judge**

**No. M2003-01035-CCA-R3-PC - Filed March 22, 2004**

The petitioner, Marquez Crenshaw, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his five especially aggravated kidnapping convictions, his especially aggravated robbery conviction, and his aggravated burglary conviction and resulting effective sentence of twenty-seven years. He claims he received the ineffective assistance of counsel, primarily regarding the failure to present alibi evidence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Bruce A. Poag, Nashville, Tennessee, for the appellant, Marquez Crenshaw.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Stephen Douglas Thurman and Brian Keith Holmgren, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The petitioner's convictions relate to his actions toward several victims on November 12, 1998. This court affirmed his convictions on direct appeal and provided the following factual account of the offenses:

> In the early morning hours of November 12, 1998, four masked men broke into the north Nashville two-bedroom home of Betty Jean Mitchell. Ms. Mitchell and her boyfriend, Michael Pritchard, were asleep in one bedroom, and Ms. Mitchell's two sons, eighteen-year-old Mario Mitchell and thirteen-year-old Geno Smith, were asleep in the second bedroom, when men shouting "Police! Police!" kicked in the front door of their home on Vance Avenue.

The armed, masked men who entered the house were not the police. They bound Ms. Mitchell, Michael Pritchard, and Geno Smith with duct tape, and shot Mario Mitchell twice in the leg, demanding that he tell them where the money and guns were hidden. Ransacking the house, the men found and took approximately $800 in cash and a nine-millimeter gun belonging to Mario. When they threatened to kill him if he did not tell them where the rest of the money was hidden, Mario lied, telling them that his cousin was staying at Mario's former residence, a house on 12th Avenue, and that they would find his money there. Instead of leaving him behind, the men dragged Mario into the hallway, where they shot him again in the leg. They then carried him outside to his sport utility vehicle, put him inside, and drove him to his former residence.

At the house on 12th Avenue, the men took Mario to the back porch and ordered him to yell for his cousin. When the man and woman who were in the apartment came out, the men forced either one or both of them back inside at gunpoint, ransacked the apartment, and demanded money. Before taking flight, one of the men shot Mario once more, grazing his chest with a bullet. While still in the emergency room, Mario told police that he had recognized three of the men as acquaintances from his neighborhood. Approximately one week later, he identified all three defendants from a series of photographic lineups.

State v. Leonard Edward Baugh, Jr., No. M2000-00477-CCA-R3-CD, Davidson County, slip op. at 2 (Tenn. Crim. App. June 1, 2001), app. denied (Tenn. Oct. 1, 2001).

The petitioner's central claim is that his attorney did not use his mother and girlfriend as alibi witnesses. At the post-conviction evidentiary hearing, Hazel Jackson, the petitioner's mother, testified that she had approximately twelve conversations with the petitioner's trial attorney, most by telephone. She said she told the attorney that her son, Tyronya Buckley, their baby, and Ms. Jackson's boyfriend were at her home during the early morning hours of November 12, 1998. She said she told the attorney that when she went to bed around 2:00 a.m., the petitioner and Ms. Buckley were still awake. She said she told the attorney that she awoke around 4:00 a.m. when she heard the baby crying. She said that when she entered the petitioner's room to check on the baby, the petitioner was lying on the bed. She said she got a bottle for the baby but did not go back to sleep because it was only an hour before she had to get up for work. She said that before 8:00 a.m., the police arrived at her home and told her that her car had been used in a "burglary homicide." She said that she told the police that her car was outside but that when she checked, the car was missing. She said that the police then took her to her car in north Nashville but that they did not tell her they suspected her son was involved in the crime. She said that she told the petitioner's trial attorney

about her version of the early hours of November 12, 1998, but that he always told her that they would talk about her story later.

Ms. Jackson testified that she was never asked to testify by the petitioner's trial attorney. She said that while she was waiting at the courthouse for trial, the prosecutor talked to her and that he later called her to testify. She said that when the petitioner's attorney cross-examined her, he did not ask her about the petitioner's whereabouts on November 12, 1998. She said she was upset and later asked the trial attorney why he had not used her as an alibi witness, to which he responded that he would use her testimony later. She testified that her testimony at the evidentiary hearing was truthful. On cross-examination, Ms. Jackson testified that she mentioned to several police officers that the petitioner had been at her home that night but that she did not remember who those policemen were. She acknowledged that when the prosecutor called her to testify, she did not tell the jury about her alibi testimony. She acknowledged that the petitioner knew the codefendants in the case.

Tyronya Buckley, the defendant's girlfriend at the time of the incident, testified that she spoke with the petitioner's trial attorney six or seven times before the petitioner's trial. She said that she told him that the petitioner was in bed with her throughout the night on November 12, 1998, but that the attorney was not interested in her story. She said that they went to bed around 2:00 a.m. and that the petitioner had been with her three to four hours before that. She said that their baby cried during the night and that the petitioner's mother came in to check on the baby, bringing the baby a bottle. She said she was present when the police told Ms. Jackson that her car had been used in a robbery and kidnapping. She said she was shocked at the trial when the petitioner's attorney did not ask Ms. Jackson about the petitioner's whereabouts on November 12. She said she would not lie to help the petitioner.

On cross-examination, Ms. Buckley testified that over the last two years, she had talked to the petitioner about once a week. She acknowledged that she was claiming that she had crucial testimony that could have proved the petitioner's innocence. She admitted, however, that she never told the district attorney or detectives about this crucial knowledge. She said that when she talked to the district attorney, she did not tell him her information because she did not know who he was at that time. On redirect examination, Ms. Buckley testified that she believed that the petitioner's attorney was the person to whom she should tell her information.

The petitioner testified that while his case was in juvenile court, his trial attorney met with him three or four times for about fifteen to twenty minutes each time. He said that after his case was transferred to criminal court, his attorney only met with him on days he was scheduled to go to court. He said that on the weekend before trial, his attorney's assistant met with him for about one and one-half hours. He said that he told his attorney that he had alibi witnesses and that his attorney responded that he would take care of it. He said that in the early morning hours of November 12, 1998, he was at home with his mother, her boyfriend, Ms. Buckley, and their baby. He said that when the police arrived, he told them he had been in bed all night. He said that when his mother testified at his trial, his attorney would not ask her the questions that the petitioner had told him to

ask. He said he gave his attorney written questions he had prepared because he wanted his attorney to ask his mother these questions. He said his attorney should have questioned Mario Mitchell, the victim who identified the petitioner as one of the persons involved in the crime, more thoroughly about discrepancies between his testimony at the transfer hearing and his testimony at trial. He said that his attorney did not explain the length of sentence he might receive and that he thought the longest sentence he could receive was twelve years. He said that although his trial attorney handled his appeal, his attorney never asked the petitioner about what issues to raise and did not inform the petitioner when his appeal was denied.

On cross-examination, the petitioner testified that his alibi witnesses did not testify at the transfer hearing but that he was not upset at his attorney for failing to call them at that time. He said he wanted his case to be transferred to criminal court in order for him to be given a bond. He acknowledged that he did not ask for a new attorney at trial or on appeal. He said that after being found guilty, his attorney continued to represent him in other cases. He said that in a separate case, he pled guilty to attempted second degree murder and acknowledged that the codefendants from that case, Damien Owes and Leonard Baugh, were also involved in this one. He denied that he was in a gang and said that Owes was untruthful if he had testified that the petitioner was in a gang. He said his tattoos were not gang symbols, but rather referred only to where he lived. He said that he did not remember if his mother's car was hot-wired when it was returned to her on November 12, 1998, and that it was a coincidence that her car had been used in a robbery. He acknowledged that Mr. Mitchell identified him in a photograph array but said Mr. Mitchell only identified him because he had known the petitioner before the line-up. He said he had seen Mr. Mitchell about four to five times before November 12. He said that if the prosecution had offered a sentence of ten to twelve years, he still would have gone to trial because he was innocent. He said he did not testify at trial because he was worried about other cases against him. He said his mother and Ms. Buckley were not at the sentencing hearing because he did not want them to be involved. On redirect examination, the petitioner testified that his trial attorney was appointed and that he did not get to choose who would represent him.

The petitioner's trial attorney testified that he discussed and explained the petitioner's case to him while the petitioner was in juvenile court. He said that he could not remember the number of times he met with the petitioner after his case was transferred to criminal court but remembered talking about the case in detail with the petitioner. He said that the petitioner insisted on going to trial and was not interested in a plea agreement. He said that by the time of trial, he was very prepared for the petitioner's case. He said that Ms. Jackson told him prior to trial that when she went to bed on November 12, 1998, the petitioner was already in bed. He said, however, she never told him that she got up during the night to check on the baby and saw the petitioner. He said Ms. Jackson, instead, told him that she did not see the petitioner again until the police arrived the next morning. He said that he told the petitioner that he was concerned with Ms. Jackson's credibility and that the petitioner agreed with his decision not to examine her as an alibi witness. He said that if the petitioner had insisted, he would have called the petitioner or Ms. Jackson to testify at trial. He said he did not remember receiving any notes from the petitioner about what questions to ask Ms. Jackson at trial. He said he remembered Ms. Buckley, but he did not recall her claiming to have

knowledge of the petitioner's whereabouts on November 12. He said that Mr. Mitchell's testimony at the transfer hearing and at the trial did not necessarily conflict. He said he urged the petitioner to settle the case and explained fully the possible sentences if convicted.

The trial court denied the petition for post-conviction relief. It concluded that the petitioner did not receive the ineffective assistance of counsel, finding that the petitioner's alibi witnesses lacked credibility. The court also found that the petitioner knew the potential sentence he was facing and that his attorney explained the possible sentences sufficiently. In addition, the trial court determined that the petitioner's attorney was adequately prepared for trial, that he cross-examined witnesses sufficiently, and that he was not ineffective in his handling of the petitioner's appeal.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See Hellard, 629 S.W.2d at 9; DeCoster, 487 F.2d at 1201.

In a post-conviction case, the burden is on the petitioner to prove by clear and convincing evidence his grounds for relief. T.C.A. § 40-30-110(f) (2003). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

The petitioner contends that counsel was ineffective by failing to call Ms. Jackson and Ms. Buckley as alibi witnesses at trial. As noted, the trial court found that both Ms. Jackson and Ms.

Buckley's testimony lacked credibility. The trial court took into account that Ms. Jackson testified at trial and failed to mention this critical information. Also, the petitioner's attorney testified that Ms. Jackson's story had changed at the post-conviction hearing and that he never remembered Ms. Buckley ever telling him that she was with the petitioner on November 12, 1998. Moreover, the petitioner's trial attorney testified that the petitioner agreed with him at trial that Ms. Jackson's testimony was not credible. We believe the trial court properly concluded that the petitioner's attorney was not ineffective for failing to use Ms. Jackson and Ms. Buckley as alibi witnesses.

The petitioner next contends that counsel was ineffective by not explaining the amount of time he could receive if convicted. The trial court found that the petitioner was aware of how much time he might receive if convicted. Trial counsel testified that he explained in detail the amount of jail time the petitioner could receive. In addition, the petitioner himself acknowledged that he would not have pled guilty no matter how great his sentence would have been if convicted because he was innocent. In this respect, the petitioner could not show prejudice even if he could prove that counsel misinformed him of the possible sentence length. In any event, the evidence does not preponderate against the trial court's finding that the petitioner was aware of the potential sentences he could receive if convicted was correct.

With regard to the petitioner's claim that he received the ineffective assistance of counsel because his attorney was inadequately prepared for trial, the trial court noted that the attorney said he met with the petitioner both before and after the case was transferred to criminal court. He also testified that he discussed the case with the petitioner in detail. The evidence does not preponderate against the trial court's finding that the petitioner's trial attorney was adequately prepared for the case. As to the petitioner's claim that his attorney was deficient in cross-examining witnesses, we believe that the trial court also properly rejected this allegation. The defendant presented no evidence showing that his trial attorney's cross-examination of Mr. Mitchell was deficient nor did he show any prejudice resulting from this cross-examination. Finally, as to the petitioner's assertion that his attorney was ineffective in his handling of the appeal, we note that no specific action or nonaction is identified as inappropriate. In any event, the record fully supports the trial court's findings and conclusions regarding the quality of representation received by the petitioner. We conclude that the petitioner has failed to show that he received the ineffective assistance of counsel.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE